# Exhibit A

Received and E-Filed for Record
5/28/2021 12:01 PM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Rachel Gallagher

CAUSE NO. ___21-06-07552___

| | | |
|---|---|---|
| JENNIFER BRIDGES, BOB NEVENS | § | IN THE DISTRICT COURT OF |
| MARIA TREVINO, RICARDO ZELANTE, | § | |
| LATRICIA BLANK, BENNIE LOPEZ, | § | |
| TAMMY LINKENHOKER, MADELINE DIB, | § | |
| HUNTER WARD, AMBER KIMICH, ALISON | § | |
| ANTU, BETTY SAMUEL, VICTORIA WEBB, | § | |
| EDNA BARRERA, JOSEPH HOYT, | § | |
| PRISCILLA LARA, KARA SHEPHERD, | § | Montgomery County - 457th Judicial District Court |
| GILBERTO LARA, LUZ HERNANDEZ, | § | |
| ASHLEY HEINRICH, KATIE YARBER, | § | |
| JENNIFER WARREN, JOANN CRUMP | § | |
| CREAMER, TATYANA LAZARENKO, | § | |
| RANDI VINCENT, ANA ESCOBAR, | § | |
| ADRIANA GALVAN, STARLA | § | |
| HAUGENATER, JADE HERNANDEZ, | § | |
| LAURA BOWDEN, MONICA ESTRELLA, | § | |
| ALEXIS LOPEZ, KATHARINE BROL, | § | MONTGOMERY COUNTY, TEXAS |
| CHARLES VARGNESE, ARLIN CAMERON | § | |
| ASHTON HANLEY, ASHLEY LEON, JUDITH | § | |
| ANDRIKO, MONA WILSON, JULIE DE | § | |
| TORRE, STACEY HANZELKA, SARA PIKA, | § | |
| LATASHA WOODS, CELINA ELVIR, | § | |
| GIOVANNI SAVANS, BRIAN FELGERE, | § | |
| NICOLE SMITH, JONAE POWELL, TARA | § | |
| HANSEN, TERAH TREVINO, STEPHANIE | § | |
| DUNLAP, PAMELA ROBINS, BRENDA | § | |
| ESCOBAR, PIERRE CHARLAND, JAMES | § | |
| MCCANN II, MICHELLE FUENTES, | § | |
| CHERRI MOSLEY, AHMED MONTGOMERY | § | |
| AMANDA BLANTON, JOHN LASSEIGNE, | § | |
| LINDA PICKARD, DANA JANOCH, | § | |
| DAJUANA ARMSTRONG, AVERI REED, | § | |
| AMBER BAKER, JAMES SMILEY, DARIUS | § | |
| GARDNER, KARENE TANNER, MCKENLI | § | |
| PINKNEY, SAUL RODRIGUEZ, BROOKE | § | |
| LIGHTHALL, LORRI CURTO, KIMBERLY | § | |
| RENSI, MARY APACWAY, MATHEA | § | |
| VOLESKY, SANTANA HENDERSON-JONES, | § | |
| KIM MIKESKA, BRANDY MANN, LAURICA | § | |
| WOOTEN, LEEVETRA SEALS, | § | |
| CHRISTINA PINEROS, BRIAN CLEGG, | § | |

KATHERINE SWEITZER, NORMA MILLER §
CARMEN LATORRE, FREENEA STEWART, §
THERESA PORCHE, DEBRA BAUGH, §
SHARON HOLLIER, SAMANTHA HANLON §
TERYN ESSLER, KAREN WITT, §
JEFFREY HINTON, ANGELA LAVESPERE §
SIERRA DOCKRAY, SANDRA §
ALTAMIRANO, JOHN BROCKUS, ROBERT §
MORIN, OSCAR ZAMUDIO, CYNTHIA §
STRAUSS, ROGELIO MENDEZ, SAVANNAH §
HANSON, JASON JIMENEZ, ALEXANDRA §
WILLIAMS, STEPHANIE HILTON, ELSA §
MEJIA, SHAUNA HERIN, PAUL HERIN, §
SHAYLONDA JACKSON, ZORETTA CURRY §
CYNTHIA PUENTE, SHERRY COLBERT, §
REBEKAH FONTENOT, ROSE ALDAYA, §
TIMOTHY ROSILEZ, WALTER INFANTES, §
§
    **Plaintiffs,** §
§
**V.** §
§
THE METHODIST HOSPITAL D/B/A THE §
METHODIST HOSPITAL SYSTEM, AND §
HOUSTON METHODIST THE WOODLANDS §
HOSPITAL, §
§
    **Defendants.** §       _____**JUDICIAL DISTRICT**

## <u>PLAINTIFFS' ORIGINAL PETITION</u>

> **"100% vaccination is more important than your individual freedom. Everyone of you is replaceable.  If you don't like what your doing you can leave and we will replace your spot."**

*David Bernard, CEO, Houston Methodist San Jacinto Hospital*

For the first time in the history of the United States, an employer is forcing an employee to participate in an experimental vaccine trial as a condition for continued employment. On or about March 31, 2021, Defendants The Methodist Hospital ("Methodist") and Houston Methodist The

Woodlands Hospital ("Woodlands Hospital") became the first major health care system in the country to force it employees to be injected with an experimental COVID-19 mRNA gene modification injection ("experimental vaccine") or be fired. Methodist Hospital is forcing its employees to be human "guinea pigs" as a condition for continued employment.

### COVID-19 Investigational Vaccine Not Approved by the FDA

On December 11, 2020, the United States Food and Drug Administration ("FDA") issued the first emergency use authorization ("EAU") for an experimental vaccine for the prevention of coronavirus disease 2019 ("COVID-19").  Emergency use authorization is not an FDA approval. The experimental vaccine has been in existence for less than a year. The first reported use of the experimental vaccine was December 14, 2020.

It is undisputed that the vaccine being forced upon Plaintiffs is "unapproved".  Even though the FDA granted emergency use authorization for the Pfizer/BioNTech and Moderna vaccines in December 2020, the clinical trials the FDA will rely upon to ultimately decide whether to license these and other COVID-19 experimental vaccines are still underway and are designed to last for approximately two (2) years to collect adequate data to establish if these vaccines are safe and effective enough for the FDA to approve. The abbreviated timelines for the emergency use applications and authorizations means there is much the FDA does not know about these products even as it authorizes them for emergency use, including their effectiveness against infection, death, and transmission of SARS-CoV-2, the virus that is allegedly the cause of the COVID disease. Given the uncertainty about the COVID-19 experimental vaccines, the FDA requires that each dose of the experimental vaccine shall have a label that states that the product is an emergency use authorization, that the EAU is explicit that each is "an investigational vaccine not licensed for any indication" and that all "promotional material relating to the Covid-19 Vaccine clearly and

conspicuously…state that this product has not been approved or licensed by the FDA, but has been authorized for emergency use by FDA".  (Exhibit "A-1", EAU letter for Pfizer)

The FDA on their website has stated the following:

"FDA believes that terms and conditions of an EAU issued under section 564 preempt state or local law, both legislative requirement and common-law duties, that impose different or additional requirements on the medical product for which the EAU was issued in the context of the emergency declared under section 564… In an emergency, it is critical that the conditions that are part of the EAU or an order or waiver issued pursuant to section 564A – those that FDA has determined to be necessary or appropriate to protect the public health-be strictly followed, and no additional conditions be imposed."

In August 2020, the Centers for Disease Control and Prevention ("CDC") published a meeting of the Advisory Committee on Immunizations and Respiratory Diseases, Dr. Amanda Cohn stated (@1:14:40):

"I just wanted to add that, just wanted to remind everybody, that under an Emergency Use Authorization, an EAU, vaccines are not allowed to be mandatory. So, early in the vaccination phase, individuals will have to be consented and they won't be able to be mandated."

Here, Plaintiffs have been terminated from their jobs and others are in imminent and immediate danger of being terminated from their jobs for refusing to take an experimental vaccine that is being provided under an EAU.

### The Rush to Find an Experimental COVID-19 Vaccine

On January 30, 2020, the World Health Organization ("WHO") declared a "public health emergency of international concern over the global outbreak" of COVID-19. Among other recommendations, WHO called for the accelerated development of "vaccines", therapeutics and diagnostics."  The following day, U.S. Health and Human Services ('HHS") Secretary, Alex Azar, declared a national Public Health Emergency ("PHE") retroactive to January 27, 2020, "to aid the nation's healthcare community in responding" to COVID-19. By then, HHS was already collaborating with the pharmaceutical industry regarding the development of vaccines.

In April 2020, the national Administration announced Operation Warp Speed ("OWS") – a public/private partnership to develop and distribute a vaccine for COVID-19 by the end of 2020 or early 2021. The process for developing a vaccine normally takes place in several phases, over a period of years.

The general stages of the development cycle for a vaccine are:

    a.    Exploratory stage;
    b.    Pre-clinical stage (animal testing);
    c.    Clinical development (human trials - see below);
    d.    Regulatory review and approval;
    e.    Manufacturing; and
    f.    Quality control[1]

The third stage, clinical development, is itself a three-phase process:

a.    During Phase I small groups of people receive the trial vaccine.

b.    In Phase II, the clinical study is expanded and the vaccine is given to people who have characteristics (such as age and physical health similar to those for whom the new vaccine is intended.

c.    In Phase III, the vaccine is given to thousands of people and tested for efficacy and safety.

Phase III itself normally occurs over a course of years because it can take years for the side effects of a new vaccine to manifest themselves. Phase III must be followed by a period of regulatory review and approval. During this stage, data and outcomes are reviewed by peers and by the FDA.  Finally, the manufacturer must demonstrate that the vaccine can be manufactured under conditions that assure adequate quality control.

---

[1] https://www.cdc.gov/vaccines/basics/test-approve.html.

The timeline set by OWS telescoped what would normally take years of research into a matter of months. Commercial vaccine manufacturers and other entities proceeded with the development of COVID-19 vaccine candidates using different technologies including RNA, DNA, protein, and viral vectored vaccines. Two potential vaccines emerged early on as likely candidates: one developed by Moderna ("Moderna Vaccine") and the other by Pfizer ("Pfizer Vaccine") with both announcing Phase III trial results in November 2020. In early 2021, Janssen Biotech, Inc., submitted Phase III trial results for its adenovirus vector vaccine ("Janssen Vaccine").

### VAERS Database Identifies Serious COVID-19 Health Concerns

In 1990, the Vaccine Adverse Event Reporting Systems ("VAERS") was established as a national early warning system to detect possible safety problems in U.S. licensed vaccines.[2] VAERS is a passive reporting system, meaning it relies on individuals to voluntarily send in reports of their experiences to CDC and FDA. VAERS is useful in detecting unusual or unexpected patterns of adverse event reporting that might indicate a possible safety problem with a vaccine. This way, VAERS can provide CDC and FDA with valuable information that additional work and evaluation is necessary to further assess a possible safety concern.

There were 4,434 death reports and over 12,619 serious injuries reported to the CDC's VAERS database from COVID-19 vaccines through May 10, 2021. By comparison, from July 1, 1997, until December 31, 2013, VAERS received 666 adult death reports.[3] The flu vaccines are

---

[2] VAERS is co-managed by the CDC and the FDA. VAERS accepts and analyzes reports of adverse events (possible side effects) after a person has received a vaccination. Anyone can report an adverse event to VAERS. Healthcare professionals are required to report certain adverse events and vaccine manufacturers are required to report all adverse events that come to their attention.

[3] Pedro L. Moro, Jorge Arana, Mria Cano, Paige Lewis, and Tom T. Shimabukuro, Deaths Reported to the Vaccine Adverse Event Reporting System, United States, 1997-2013, VACCINES, CID 2015:61 (September 2015)

linked to 20–30 death reports a year, according to Dr. Peter McCullough[4], and those 20–30 death reports come with considerably more vaccines administered.[5] Arguably, if the experimental vaccine was any other vaccine or drug, it would already have been removed from the market. Usually, a new drug is withdrawn after 50 deaths, which is not typical because the FDA has a strict approval process. The COVID-19 vaccines have been exempted from the approval process, instead being temporarily "authorized" for emergency use.

Thirty-five hundred plus (3,500 +) reports is 70 times the normal threshold for pulling a drug from the market. Although this is raw data, previous VAERS studies have shown that only 1-10% of vaccine-related deaths are reported to VAERS —or less. The COVID vaccines are adding a year's worth of VAERS reports every week. In just four months, more adverse reports were added to the VAERS database than any single vaccine has had cumulatively over the past 31 years. This is clearly a safety signal, further studies need to be done and Plaintiffs should not be forced to participate in these dangerous trials as a condition for employment.

### Experimental COVID-19 Vaccines Have Not Received Final Approval from the FDA- Plaintiffs are not given a choice on whether or not they want to participate in this experimental trial.

None of the currently available experimental vaccines for COVID-19 has received final approval from the FDA. Rather, each one of the COVID-19 experimental vaccines is an unapproved product that has been granted EAU. The FDA refers to the COVID-19 experimental vaccine as "investigational products", meaning they remain classified as experimental.

---

[4] Dr. McCullough is vice chief of medicine at Baylor University Medical Center and the most cited American medical doctor on COVID-19 at the National Library of Medicine.
[5] Dr. McCullough estimated the flu shot at 195 million people annually, while over 153 million have currently received COVID vaccinations.  The disparity between these two vaccine groups is staggering.

The statute granting the FDA the power to authorize a medical product for emergency use requires that the person being administered the unapproved product be advised of his and her right to refuse administration of the product. *See* 21 U.S.C. § 360bbb-3(e)(1)(A) ("Section 360bbb-3"). Additionally, terms and conditions of EAUs preempt state and local laws that would impose obligations that are inconsistent with those terms and conditions. Here, Defendants do not inform Plaintiffs of their right to refuse administration of the experimental vaccine. In fact, Plaintiffs are not given a choice as to whether or not they want to participate in the experimental vaccine trials. The only choice the Plaintiffs have is to join the experimental trial and be injected with the experimental vaccine or be fired.

**Long Standing Public Policy Against Forcing Plaintiffs to Participate in Vaccine Trial**

Section 360bbb-3 reflects a fundamental, public policy goal of striking a balance between giving people the option of having access to experimental medical products during public emergencies, while also assuring that no one is forced to accept administration of such and the experimental medical product.  Section 360bbb—further recognizes the well-settled doctrine that medical experiments, better known in modern parlance as "clinical research", may not be performed on human subjects without the express, informed consent of the individual receiving treatment.  This right to avoid the imposition of human experimentation is fundamental and has its roots in the Nuremberg Code of 1947[6] and has been ratified by the 1964 Declaration of Helsinki, and further codified in the United States Code of Federal Regulations.

**The Universal Prohibition on Human Experimentation Without Consent**

Among the horrors that emerged from the rubble of World War II were stories of

---

[6] The Nuremberg Code is a medical ethics code issued based on laws under which the Nazi criminals were judged for conducting horrible medical experiments during the Second World War, in the physicians' trial known by the name Nuremberg Trial.  The Nuremberg Code later constituted the base for the Helsinki Declaration Legislation.

barbaric medical experiments performed on unwilling victims of Nazi Germany's concentration camps.  On August 8, 1945, the prevailing Allies established an International Military Tribunal ("IMT"). Under the aegis of the IMT, the creation of U.S. military tribunals for the trial of "lower-level" war criminals, such as doctors accused of conducting medical experiments without the subject's consent was authorized.[7]  A U.S. military tribunal subsequently found 15 doctors guilty of conducting nonconsensual experiments, which included the testing of drugs for immunizations against malaria, epidemic jaundice, smallpox, and cholera. "In every single instance appearing in the record," the tribunal concluded, "subjects were used who did not consent to the experiments." The tribunal sentenced seven of the doctors to death and the remaining eight to life in prison.  As part of its final judgement, the tribunal promulgated the Nuremberg Code on Permissible Medical Experiments.

Point One of the Nuremberg Code states: "The voluntary consent of the human subject is absolutely essential."  This standard has since been repeatedly ratified and adopted around the globe, in laws, treaties, regulations, and ethical guidelines for medical research. For example, in 1964, the World Medical Association adopted the Declaration of Helsinki, which provides that human subjects "must be volunteers and informed participants in the research project." Declaration of Helsinki at Art. 20.

For these and other reasons, the prohibition against nonconsensual human experimentation must be regarded not only as established by U.S. law and regulations, but also as broadly recognized by all nations as to constitute a jus cogens norm under international law.

**Spike Protein Research Developing-Impact on Host Cells Unknown-More Studies Needed**

---

[7] Sources for the historical facts set forth herein can be found in *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009), which explains in detail the history and the reason why the prohibition against nonconsensual human experimentation should be regarded as a jus cogens norm.

The experimental SARS-CoV-2 vaccine contains laboratory synthesized mRNA in a lipid package. This mRNA enters the host's cells and hijacks the cells, causing them to produce the spike protein of the coronavirus, which elicits the development of antibodies.[8] The human host cells respond to the spike protein and elicit cell signaling.[9] The spike protein produced by the new COVID-19 experimental vaccines may also affect the host cells.[10] Scientists recommend that we monitor the long-term consequences of these experimental vaccines carefully, especially when they are administered to otherwise healthy individuals.[11]  Scientists further conclude that further investigations on the effects of the SARS-CoV-2 spike protein on human cells and appropriate experimental animal models are warranted.[12]

A recent study suggests that the SARS-CoV-2 spike protein can by itself trigger cell signaling that can lead to various biological processes.[13] The scientists who conducted the study concluded, "It is reasonable to assume that such events, in some cases, result in the pathogenesis of certain diseases."[14]  Despite the experimental nature of the vaccine and the numerous adverse side effects related to the experimental vaccine including, but not limited to, death through

---

[8] Suzuki YJ, Gychka SG. SARS-CoV-2 Spike Protein Elicits Cell Signaling in Human Host Cells: Implications for Possible Consequences of COVID-19 Vaccines. *Vaccines (Basel)*. 2021;9(1):36. Published 2021 Jan 11. doi:10.3390/vaccines9010036
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.* ("However, we need to consider their long-term consequences carefully, especially when they are administered to otherwise healthy individuals as well as young adults and children. In addition to evaluating data that will become available from SARS-CoV-2 infected individuals as well as those who received the spike protein-based vaccines, further investigations of the effects of the SARS-CoV-2 spike protein in human cells and appropriate animal models are warranted.")
[13] Suzuki YJ, Gychka SG. SARS-CoV-2 Spike Protein Elicits Cell Signaling in Human Host Cells: Implications for Possible Consequences of COVID-19 Vaccines. *Vaccines (Basel)*. 2021;9(1):36. Published 2021 Jan 11. doi:10.3390/vaccines9010036.
[14] *Id.*

anaphylactic shock[15], thrombosis with thrombocytopenia syndrome[16], blood clots, multi-system autoimmune disorders and multi-organ failure[17],  and the fact that some scientists have concluded that it is reasonable to assume the experimental vaccine will result in the pathogenesis of certain diseases, Dr. Marc Boom, the President and CEO of Defendant Houston Methodist gave employees an ultimatum - if you want to keep your job, continue to feed your family, and avoid bankruptcy, you must be injected with the experimental COVID-19 vaccine.

## I
## PARTIES

Plaintiff, Jennifer Bridges, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Bob Nevens, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital - Corporate.

Plaintiff, Maria Trevino, is an adult individual residing in Galveston County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

---

[15]  Allergic Reactions Including Anaphylaxis After Receipt of the First Dose of Pfizer-BioNTech COVID-19 Vaccine-United States, December 14-23, 2020.  MMWR Morb Mortal Wkly Rep 2021; 70:46-51. DOI: http://dx.doi.org/10.15585/mmwr.mm7002e1.

[16]  Safety monitoring of the J&J/Janssen vaccine suggests a risk of an adverse event called thrombosis with thrombocytopenia syndrome (TTS), which involves blood clots with low platelets. Platelets are a type of blood cell that help blood clot.  On April 13, the U.S. Food and Drug Administration (FDA) and the Centers for Disease Control and Prevention (CDC) suggested pausing administration of the AD26.COV2.S Johnson & Johnson (JJ) vaccine to allow investigation of several cases of a severe thrombosis with thrombocytopenia occurring post-vaccination. This announcement came on the heels of the initial reports of similar events in individuals receiving the CHaDOx1 nCov-19 AstraZeneca (AZ) vaccine outside the United States. Clinical and laboratory characteristics of TTS have recently been reported. This syndrome has been termed "vaccine-induced prothrombotic immune thrombocytopenia (VIPIT)" or "vaccine-induced immune thrombotic thrombocytopenia (VITT)" but is now termed "thrombosis with thrombocytopenia syndrome (TTS)" by the CDC and FDA.  James B. Bussel, MD et al., American Society of Hematology, *Thrombosis with Thrombocytopenia Syndrome (also termed Vaccine-induced Thrombotic Thrombocytopenia)*, April 29, 2021.

[17]

11

Plaintiff, Ricardo Zelante, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Latricia Blank, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Bennie Lopez, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist The Woodlands Hospital.

Plaintiff, Tammy Linkenhoker, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Madeline Dib, is an adult individual residing in Montgomery County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Hunter Ward, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Sugar Land Hospital.

Plaintiff, Amber Kimich, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Alison Antu, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Betty Samuel, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Victoria Webb, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Betty Samuel, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Edna Barrera, is an adult individual residing in Fort Bend County, Texas and is currently an employee at Houston Methodist Sugar Land Hospital.

Plaintiff, Joseph Hoyt, is an adult individual residing in Montgomery County, Texas and is currently an employee at Houston Methodist The Woodlands Hospital.

Plaintiff, Priscilla Lara, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Kara Shepherd, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Gilberto Lara, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Luz Hernandez, is an adult individual residing in Fort Bend County, Texas and is currently an employee at Houston Methodist Sugar Land Hospital.

Plaintiff, Ashley Heinrich, is an adult individual residing in Montgomery County, Texas and is currently an employee at Houston Methodist The Woodlands Hospital.

Plaintiff, Katie Yarber, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Jennifer Warren, is an adult individual residing in Brazoria County, Texas and is currently an employee at Houston Methodist Sugar Land Hospital.

Plaintiff, Joann Crump Creamer, is an adult individual residing in Wharton County, Texas and is currently an employee at Houston Methodist Sugar Land Hospital.

Plaintiff, Tatyana Lazarenko, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist The Woodlands Hospital.

Plaintiff, Randi Vincent, is an adult individual residing in Brazoria County, Texas and is currently an employee at Houston Methodist Clear Lake Hospital.

Plaintiff, Ana Escobar, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Adriana Galvan, is an adult individual residing in Brazoria County, Texas and is currently an employee at Houston Methodist Orthopedics & Sports Medicine Sugar Land Hospital.

Plaintiff, Starla Haugenator, is an adult individual residing in Liberty County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Jade Hernandez, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Laura Bowden, is an adult individual residing in Galveston County, Texas and is currently an employee at Houston Methodist Clear Lake Hospital.

Plaintiff, Monica Estrella, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Alexis Lopez, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, Katharine Brol, is an adult individual residing in Chambers County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Charles Vargnese, is an adult individual residing in Brazoria County, Texas and is currently an employee at Houston Methodist Hospital – Texas Medical Center.

Plaintiff, Arlin Cameron, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital – Texas Medical Center.

Plaintiff, Ashton Hanley, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Ashley Leon, is an adult individual residing in Liberty County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Judith Andriko, is an adult individual residing in Galveston County, Texas and is currently an employee at Houston Methodist Clear Lake Hospital.

Plaintiff, Mona Wilson, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, Julie De Torre, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Stacey Hanzelka, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Sara Pika, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Latasha Woods, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Celina Elvir, is an adult individual residing in Montgomery County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Giovanni Savans, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Brian Felgere, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Nicole Smith, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Jonae Powell, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Tara Hansen, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Terah Trevino, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist The Woodlands Hospital.

Plaintiff, Stephanie Dunlap, is an adult individual residing in Montgomery County, Texas and is currently an employee at Houston Methodist The Woodlands Hospital.

Plaintiff, Pamela Robins, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital – Corporate IT Web Services.

Plaintiff, Brenda Escobar, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, Pierre Charland, is an adult individual residing in Brazoria County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, James McCann II, is an adult individual residing in Harris County, Texas and is currently an employee at Texas Orthopedic Advancement.

Plaintiff, Michelle Fuentes, is an adult individual residing in Chamber County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, Cherri Mosley, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Ahmed Montgomery, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Amanda Blanton, is an adult individual residing in Galveston County, Texas and is currently an employee at Advanced Surgical Assistants.

Plaintiff, John Lasseigne, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital – Outpatient Radiology.

Plaintiff, Linda Pickard, is an adult individual residing in Chambers County, Texas and is currently an employee at Houston Methodist Cancer Center at Baytown.

Plaintiff, Dana Janoch, is an adult individual residing in Brazoria County, Texas and is currently an employee at Houston Methodist Clear Lake Hospital.

Plaintiff, Dajuana Armstrong, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Averi Reed, is an adult individual residing in Montgomery County, Texas and is currently an employee at Houston Methodist Imaging Center – Conroe.

Plaintiff, Amber Baker, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, James Smiley, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, Darius Gardner, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, Karene Tanner, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist West Hospital.

Plaintiff, McKenli Pinkney, is an adult individual residing in Fort Bend County, Texas and is currently an employee at Houston Methodist Continuing Care Hospital.

Plaintiff, Saul Rodriguez, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, Brooke Lighthall, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Lorri Curto, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, Kimberly Rensi, is an adult individual residing in Harris County, Texas and is currently an employee at Cardiva Medical Inc.

Plaintiff, Mary Apacway, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Mathea Volesky, is an adult individual residing in Fort Bend County, Texas and is currently an employee at Houston Methodist Sugar Land Hospital.

Plaintiff, Santana Henderson-Jones, is an adult individual residing in Brazoria County, Texas and is currently an employee at Houston Methodist Clear Lake Hospital.

Plaintiff, Kim Mikeska, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist West Hospital.

Plaintiff, Brandy Mann, is an adult individual residing in Galveston County, Texas and is currently an employee at Houston Methodist Clear Lake Hospital.

Plaintiff, Laurica Wooten, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Clear Lake Hospital.

Plaintiff, Leevetra Seals, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, Christina Pineros, is an adult individual residing in Fort Bend County, Texas and is currently an employee at Houston Methodist Sugar Land Hospital.

Plaintiff, Brian Clegg, is an adult individual residing in Harris County, Texas and is currently an employee at Aemonetics.

Plaintiff, Katherine Sweitzer, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Norma Miller, is an adult individual residing in Galveston County, Texas and is currently an employee at Houston Methodist Clear Lake Hospital.

Plaintiff, Carmen LaTorre, is an adult individual residing in Fort Bend County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, Freenea Stewart, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist West Hospital.

Plaintiff, Theresa Porche, is an adult individual residing in Fort Bend County, Texas and is currently an employee at Houston Methodist Sugar Land Hospital.

Plaintiff, Debra Baugh, is an adult individual residing in San Jacinto County, Texas and is currently an employee at Houston Methodist Hospital - Corporate.

Plaintiff, Sharon Hollier, is an adult individual residing in Fort Bend County, Texas and is currently an employee at Houston Methodist Sugar Land Hospital.

Plaintiff, Samantha Hanlon, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Teryn Essler, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Karen Witt, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Spring Branch Imaging Center.

Plaintiff, Jeffrey Hinton, is an adult individual residing in Harris County, Texas and is currently an employee at 3M Medical Solutions.

Plaintiff, Angela Lavespere, is an adult individual residing in Fort Bend County, Texas and is currently an employee at 3M Medical Solutions.

Plaintiff, Sierra Dockray, is an adult individual residing in Walker County, Texas and is currently an employee at Houston Methodist The Woodlands Hospital.

Plaintiff, Sandra Altamirano, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Primary Care West Houston.

Plaintiff, John Brockus, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital - Corporate.

Plaintiff, Robert Morin, is an adult individual residing in Fort Bend County, Texas and is currently an employee at Houston Metro Police - Woodlands.

Plaintiff, Oscar Zamudio, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Cynthia Strauss, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Rogelio Mendez, is an adult individual residing in Fort Bend County, Texas and is currently an employee at Houston Methodist Sugar Land Hospital.

Plaintiff, Savannah Hanson, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Jason Jimenez, is an adult individual residing in Brazoria County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, Alexandra Williams, is an adult individual residing in Fort Bend County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, Stephanie Hilton, is an adult individual residing in Galveston County, Texas and is currently an employee at Houston Methodist Hospital - Billing.

Plaintiff, Elsa Mejia, is an adult individual residing in Fort Bend County, Texas and is currently an employee at Houston Methodist Sugar Land Hospital.

Plaintiff, Shauna Herin, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Paul Herin, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Shaylonda Jackson, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Hospital.

Plaintiff, Zoretta Curry, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Continuing Care Hospital.

Plaintiff, Cynthia Puente, is an adult individual residing in Chambers County, Texas and is currently an employee at Houston Methodist Baytown Hospital.

Plaintiff, Sherry Colbert, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Rebekah Fontenot, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist West Hospital and Houston Methodist Continuing Care Hospital.

Plaintiff, Rose Aldaya, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Timothy Rosilez, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Plaintiff, Walter Infantes, is an adult individual residing in Harris County, Texas and is currently an employee at Houston Methodist Willowbrook Hospital.

Defendant, The Methodist Hospital D/B/A The Methodist Hospital System, is a corporation duly authorized to conduct business within the State of Texas.  Defendant may be served through its registered agent:  CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

Defendant, Methodist Health Centers d/b/a Houston Methodist The Woodlands Hospital, is a corporation duly authorized to conduct business with the State of Texas located at 17201 Interstate 45, The Woodlands, Texas 77385, Montgomery County, Texas.  Defendant may be served through its registered agent:  CT Corporation System, 199 Bryan St., Ste. 900, Dallas, Texas 75201-3136.

## II
## JURISDICTION, VENUE, RULE 47 DISCLOSURE, DISCOVERY CONTROL PLAN

The Court has subject-matter jurisdiction under the Texas Constitution, Article V, § 8, as the amount in controversy exceeds the minimum jurisdictional limits of the court of exclusive interest. Plaintiffs seek relief that can be granted by courts of law or equity.

The Court has jurisdiction over the Plaintiffs' request for declaratory relief against Defendants under Tex. Civ. Prac. & Rem. Code §§ 37.004, 37.006.

Venue is proper in Montgomery County, Texas, because the cause of action arose in Montgomery County, Texas. Many of the Plaintiffs are employed by Defendant Houston Methodist The Woodlands Hospital located at 17201 Interstate 45, The Woodlands, Texas 77385, Montgomery County, Texas.

The Court has jurisdiction over the Plaintiffs' request for injunctive relief. *See* Tex. Civ. Prac. & Rem. Code § 65.021.

Plaintiffs have standing to seek declaratory and injunctive relief because they are adversely and irrevocably harmed by the illegal policy Defendants are implementing.

The Court has personal jurisdiction over the Defendants.

Venue is proper in Montgomery County, Texas because all or a substantial part of the events giving rise to the claim occurred in Montgomery County, Texas. Specifically, numerous Plaintiffs work at Defendant The Woodlands Hospital, Montgomery County, Texas, where they are being threatened with termination or have been terminated and/or reprimanded for refusing to take the experimental COVID-19 vaccine. *See* Tex. Civ. Prac. & Rem. Code § 15.002(a)(1).

### III
### FACTUAL BACKGROUND

1.      On April 1, 2021, Defendants Methodist and The Woodlands Hospital issued a policy "requiring mandatory immunization of all covered Houston Methodist (HM) employees." (Exhibit "A") The policy was to be implemented in phases. Phase 1 included management personnel and the policy was updated as additional phases were defined and implemented. (Exhibit "A") Shockingly, the policy memo fails to recognize, appreciate, or identify that the "mandatory immunization" and "vaccination program" requires the employee to be injected with

an experimental vaccine that has not been approved by the FDA.  In fact, the memos and most statements from Defendants avoid mentioning the experimental/investigational nature of the vaccine.  The experimental vaccine program mandated by Defendants was to be coordinated through each Houston Methodist entity's Employee Health Department.  (Exhibit "A")

### HM Phase 1 Employees

2.      Each HM Phase 1 employee was required to be injected with the experimental vaccine on or before April 15, 2021, or submit all required documentation for an exemption based on a medical condition (including pregnancy deferment) or sincerely held religious beliefs on or before April 7, 2021. (Exhibit "A") Defendants have arbitrarily denied the religious exemptions and exemptions based on a medical condition.

3.      HM Phase 1 employees who did not receive the experimental vaccine by April 15, 2021 or did not have an approved exemption, were placed on a two-week, unpaid suspension. (Exhibit "A") If the employee refuses to participate in the experimental vaccine trial, Defendants will "immediately initiate the employment termination process…." (Exhibit "A") Defendants' HM Phase I policy concludes by stating, "All employees who have not received both doses of the [experimental] vaccine or are denied an exemption as of the completion of the applicable 14-day suspension period will be terminated from employment by HM."  (Exhibit "A")

4.      The policy pressures managers to "[e]nsure 100% of covered employees are aware of this policy, the mandatory [experimental] vaccine requirement, the exemption process, and any applicable educational materials regarding the vaccine…."  (Exhibit "A") This policy has resulted in managers harassing employees and pressuring, coercing and/or threatening employees in an effort to force them to be injected with the experimental vaccine.

### Boom Misleads and Threatens Methodist Employees - "Now it is your Turn"

5.      In the President's Letter from April 2021, Marc L. Boom, M.D., CEO of Defendant Houston Methodist, writes to non-managers, "[I]ts now time for all employees to be vaccinated against this deadly virus.  We first mandated the vaccine for our newly hired employees and for executives and managers who are now 100% compliant.  Now it is your turn….Those of your who have not been vaccinated yet have until June 7.  Please see the HR policy that outlines the consequences of not being compliant by June 7, which include suspension and eventually termination." (Exhibit "B")

6.      Boom then likens the process to mandating the flu vaccine in 2009.  (Exhibit "B") Knowing that the experimental vaccine was first used as part of an experimental trial in December 2020, and that no animal studies have been conducted with the experimental vaccine, Boom misleads employees, writing, "Because science has proven that the COVID-19 vaccines are not only safe, but extremely effective, it became an easier decision to make." (Exhibit "B") Boom then acknowledges, but dismisses the risk associated with the Johnson & Johnson vaccine and further attempts to mislead the employee into believing that "the FDA's recent decision to pause the administration of the Johnson & Johnson vaccine proves how carefully the vaccines are being monitored." (Exhibit "B") Boom then tries to ignore and avoid the issues associated with the J&J experimental vaccine, stating, "We primarily administer the Pfizer vaccine, which uses mRNA technology…."  (Exhibit "B")

7.      Boom concludes his letter by bragging about how he is "leading the way" in the health care industry, claiming that it takes "courage to be the first and make tough decisions for the right reasons." (Exhibit "B") To further bolster his position and leadership skills, Boom attaches to the letter an editorial he "shared with a few media outlet." (Exhibit "B")

8.      Knowing that those who chose not to receive the experimental vaccine will be fired,

Boom concludes the President's Letter with a veiled threat stating, "I sincerely hope you all make the right decision and decide to get vaccinated if you haven't already."  (Exhibit "B") Shockingly, Boom fails to mention one word about the experimental nature of the vaccine, the lack of animal studies, and the ultimatum behind his policy - be injected with an experimental vaccine or be fired.

### HM Phase 2 Employees

9.     On April 14, 2021, Defendant Methodist revised its April 1, 2021 memo to include HM Phase 2 employees.  (Exhibit "C") HM Phase 2 employees are defined by Defendant Methodist "as all HM employees not covered in Phase 1."  (Exhibit "C")

10.     The HM Phase 2 employees are subject to the same mandatory requirements identified in the April 1, 2021 memo; however, the deadlines for complying with the mandate are different. Specifically, HM Phase 2 employees are required to "get any approved one-dose vaccine (e.g. J&J) or provide proof of vaccination by a third-party provider to Employee Health on or before June 7, 2021."  (Exhibit "C") HM Phase 2 employees are required "[t]o receive both doses of any approved two-dose vaccine (e.g., Pfizer, Moderna) through HM, or provide proof of vaccination from a third-party provider on or before June 7, 2021."  (Exhibit "C") The employee who fails to timely comply with the Defendants self-imposed deadlines will be "placed on unpaid suspension for up to 14 days so that the employee can come into compliance." (Exhibit "C") "All employees who have not received both doses of the vaccine or meet the exemption requirements as of the completion of the applicable 14-day suspension period will be terminated from employment by HM."  (Exhibit "C")

### Profits Over People

11.     As CEO, Boom tries to increase company profits by "leading the way" and enticing potential patients to Defendant Methodist at the expense of other health care providers who do not

force their employees to be human "guinea pigs" as a condition for employment. For Mr. Boom

and Defendants, this is about profit, not people. In fact, Defendants recently sent out marketing

material stating,

> "YOUR HEALTH IS STILL IMPORTANT:Houston Methodist Leading Medicine
>
> No matter what's going on in the world, taking care of your health should always be a priority.  At Houston Methodist, our primary and specialty care doctors are available to provide expert care for you and your family-safely.  And we are taking it one step further to protect you:  Houston Methodist will require all employees and employed physicians to get a COVID-19 vaccine."

(Exhibit "D")

12.     To promote its business and increase profits at the expense of other health care

providers and their employees' health, Defendants advertise to the public that they "require all

employees and employed physicians to get a COVID-19 vaccine."  (Exhibit "D") More clearly,

Defendants' employees are being forced to serve as human "guinea pigs" to increase Defendants'

profits.

**Boom and Defendants' Policies Violate the Principles Established in the Nuremberg Code**

13.     The threats and coercion Dr. Boom is executing requires the employee to subject

themselves to medical experimentation as a prerequisite to feeding their families. This type of

compelled medical experimentation on humans is consistent with the policy behind the creation of

the Nuremberg Code. Informed consent to participate in a medical experiment is the first principle

of the Nuremberg Code. It requires that the individual be informed of the risks and benefits of the

experiment. The individual must have freedom of choice without force, deceit, fraud, threat,

solicitation, or any type of binding or coercion.

14.     Here, Defendants fail to inform its employees that they are taking part in a medical

experiment and that their consent is required for this under the Nuremberg Code. This, as a matter of fact, is a gene modification medical experiment on human beings, performed without informed consent. It is a severe and blatant violation of the Nuremberg Code and the public policy of the state of Texas.

15.     Additionally, with respect to the subject of informed consent, and based on the Nuremberg principles for medical treatment/experimentation, an obligation exists to detail and suggest alternative treatments. Here, Plaintiffs are not given the option for any alternative treatments other than taking the experimental COVID-19 vaccine.   Moreover, Defendants must detail the medical process (and all that is included in it) as well as the advantages and the disadvantages/benefits and risks, existing in every treatment, to enable Plaintiffs to make an intelligent personal decision regarding the treatment they prefer.   This must be done freely, without any coercion.   Here, Defendants pressure their employees and solicit them (while blatantly violating the informed consent process). The Defendants conceal the information regarding the experimental vaccines' potential risks and harms, creating an atmosphere of fear and coercion.

## IV. CAUSES OF ACTION

**COUNT ONE:  WRONGFUL DISCHARGE (*Sabine Pilot*)**

16.     Pursuant to Texas state law, Plaintiffs plead a cause of action against Defendants for wrongful termination under the Sabine Pilot exception to the employment-at-will doctrine.  The allegations contained in all of the preceding paragraphs of this Petition are hereby realleged and incorporated herein for all purposes with the same force and effect as if set forth verbatim herein.

17.     In *Sabine Pilot v. Service, Inc. v. Hauck*, the Supreme Court of Texas created a public policy exception to the employment-at-will doctrine. 687 S.W.2d 733, 735 (Tex. 1985). This exception allows an employee to sue for wrongful termination if he is fired for the sole reason that he refused to perform an illegal act. *Texas Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629,

633 (Tex. 1995); *see Safeshred, Inc. v. Martinez,* 365 S.W.3d 655, 664 (Tex. 2012) ("A plaintiff may not bring a *Sabine Pilot* claim immediately after being asked to perform an illegal activity but must first refuse and be fired.").

18.     Defendants violated the public policy of Texas because: (1) it required Plaintiffs to commit and engage in an illegal act; (2) Plaintiffs refused to engage in the illegality; (3) Plaintiffs were discharged by Defendants; and (4) the sole reason for Plaintiffs' discharge was their refusal to commit or engage in an unlawful act.

19.     Plaintiffs suffered damages in an amount in excess of the minimum jurisdictional limits of the Court.

20.     Defendants' wrongful acts have caused injury to Plaintiffs.  Plaintiffs have suffered lost wages, loss of earnings capacity, lost benefits, lost future earnings, mental anguish, inconvenience, and loss of enjoyment of life as a direct result of Defendants' unlawful actions against them.  Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future.  Plaintiffs also seek punitive damages as the result of Defendants' malicious, reckless conduct surrounding Plaintiffs' termination.

## COUNT TWO: VIOLATION OF AT-WILL EMPLOYMENT DOCTRINE/PUBLIC POLICY EXCEPTION

21.     The Mandatory COVID-19 Vaccination Directive issued by Defendants is in direct violation of Federal law, specifically 21 U.S. Code § 360bbb-3 – Authorization for medical products for use in emergencies. That law states that where a medical product is "unapproved" then no one may be mandated to take it. At Section (e)(1)(A) of the a forementioned statute it states:

With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:

(i)    Appropriate conditions designed to ensure that the health care professionals administering the product are informed –

(ii)   of the significant known and potential benefits and risks of the emergency use of the product, and of the extent to which such benefits and risks are unknown; and

(iii)  of the alternatives to the product that are available, and of their benefits and risks.

(iv)   Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—

(v)    that the Secretary has authorized the emergency use of the product;

(vi)   of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

**(vii)  of the option to accept or refuse administration of the product,** of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks. (emphasis added)

22.    The Defendants violated at least two quoted sections (ii and iii). The Defendants did not advise Plaintiffs of the "known and potential benefits and risks of such emergency use of the product, and of the extent to which such benefits and risks are unknown" of the COVID-19 experimental vaccine. Additionally, Plaintiffs are not provided "the option to accept or refuse administration of the…" experimental vaccine as a condition for employment.  Such conduct is in violation of the public policy of this state and is the basis for an exception to the at-will employment doctrine.

23.    It is questionable for the Defendants to require its employees to take the emergency experimental vaccine after more than 1.5 years have elapsed since the event giving rise to the emergency occurred.

24.     Plaintiffs suffered damages in an amount in excess of the minimum jurisdictional limits of the Court.

25.    Defendants' wrongful acts have caused injury to Plaintiffs.  Plaintiffs have suffered

lost wages, loss of earnings capacity, lost benefits, lost future earnings, mental anguish, inconvenience, and loss of enjoyment of life as a direct result of Defendants' unlawful actions against them.  Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future.  Plaintiffs also seek punitive damages as the result of Defendants' malicious, reckless condition surrounding Plaintiffs' termination.

## COUNT THREE – DECLARATORY RELIEF

26.    Plaintiffs request the Court issue declaratory relief under Tex. Civ. Prac. & Rem. Code §§ 37.004 and 37.006 that:

(a.) 21 U.S. Code § 360bbb-3, Section (e)(1)(A) does not permit Defendants to coerce an employee to accept an FDA unapproved vaccine on penalty of termination or other sanctions.

(b.) The doctrine of federal preemption invalidates and voids the "Mandatory COVID-19 Vaccination Directive" of Defendants.   Accordingly, Plaintiffs request a declaration that Defendants' above-described COVID-19 employment policy is invalid.

## COUNT FOUR - INJUCTIVE RELIEF

25.    Plaintiffs have been threatened for choosing not to take an FDA unapproved experimental vaccine which federal law states cannot be mandated because insufficient trials have been conducted and its long-term effects are not known. Currently there are many new reports of adverse effects and even deaths resulting from the experimental vaccine. Plaintiffs terminated for refusing to take an experimental vaccine which federal law states cannot be mandated, constitutes a retaliatory discharge under Texas law.

26.    The purpose of a temporary injunction is to preserve the status quo which the Texas Supreme Court defined as the "last, actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004).

27. Irreparable injury to the Plaintiffs has resulted from their termination or subsequent termination.

28.     Therefore, Plaintiffs respectfully request this Court issue a temporary injunction, after notice and hearing, restraining the Defendants, their agents, representatives, or anyone acting on their behalf until further order of the Court from terminating Plaintiffs for the sole reason of their refusal to be injected with the experimental COVID-19 vaccine.

## V. ATTORNEYS FEES

Plaintiffs request this Court award them their reasonable and necessary attorney fees and costs.  The Plaintiffs retained the Woodfill Law Firm, PC, to represent them in this action and have agreed to pay reasonable and necessary attorney's fees.

**WHEREFORE,** Plaintiffs respectfully request that the court:

1.     Enter declaratory relief as requested in Count Three

2.     Schedule this matter for a temporary injunction hearing enjoining the Defendants from terminating, demoting, or taking any negative action against Plaintiffs for refusing to take a non-mandatory, unapproved vaccine and any other relief to which the Plaintiffs may show themselves entitled.

Respectfully submitted,

**WOODFILL LAW FIRM, P.C.**

***/s/ Jared R. Woodfill***
Jared R. Woodfill
Texas Bar Number 00788715
Email: woodfillservice@gmail.com (service only)
Email: jwoodfill@woodfilllaw.com (non-service only)
3 Riverway, Suite 750
Houston, Texas 77056
(713) 751-3080 Telephone
(713) 751-3058 Facsimile
***Attorney for the Plaintiffs'***

### FACT SHEET FOR RECIPIENTS AND CAREGIVERS

### EMERGENCY USE AUTHORIZATION (EUA) OF
### THE PFIZER-BIONTECH COVID-19 VACCINE TO PREVENT CORONAVIRUS
### DISEASE 2019 (COVID-19)
### IN INDIVIDUALS 16 YEARS OF AGE AND OLDER

You are being offered the Pfizer-BioNTech COVID-19 Vaccine to prevent Coronavirus Disease 2019 (COVID-19) caused by SARS-CoV-2. This Fact Sheet contains information to help you understand the risks and benefits of the Pfizer-BioNTech COVID-19 Vaccine, which you may receive because there is currently a pandemic of COVID-19.

The Pfizer-BioNTech COVID-19 Vaccine is a vaccine and may prevent you from getting COVID-19. There is no U.S. Food and Drug Administration (FDA) approved vaccine to prevent COVID-19.

Read this Fact Sheet for information about the Pfizer-BioNTech COVID-19 Vaccine. Talk to the vaccination provider if you have questions. It is your choice to receive the Pfizer-BioNTech COVID-19 Vaccine.

The Pfizer-BioNTech COVID-19 Vaccine is administered as a 2-dose series, 3 weeks apart, into the muscle.

The Pfizer-BioNTech COVID-19 Vaccine may not protect everyone.

This Fact Sheet may have been updated. For the most recent Fact Sheet, please see www.cvdvaccine.com.

## WHAT YOU NEED TO KNOW BEFORE YOU GET THIS VACCINE?

### WHAT IS COVID-19?
COVID-19 disease is caused by a coronavirus called SARS-CoV-2. This type of coronavirus has not been seen before. You can get COVID-19 through contact with another person who has the virus. It is predominantly a respiratory illness that can affect other organs. People with COVID-19 have had a wide range of symptoms reported, ranging from mild symptoms to severe illness. Symptoms may appear 2 to 14 days after exposure to the virus. Symptoms may include: fever or chills; cough; shortness of breath; fatigue; muscle or body aches; headache; new loss of taste or smell; sore throat; congestion or runny nose; nausea or vomiting; diarrhea.

### WHAT IS THE PFIZER-BIONTECH COVID-19 VACCINE?
The Pfizer-BioNTech COVID-19 Vaccine is an unapproved vaccine that may prevent COVID-19. There is no FDA-approved vaccine to prevent COVID-19.

PLAINTIFF'S
EXHIBIT
A-1

Revised: December 2020

The FDA has authorized the emergency use of the Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19 in individuals 16 years of age and older under an Emergency Use Authorization (EUA).

For more information on EUA, see the "**What is an Emergency Use Authorization (EUA)?**" section at the end of this Fact Sheet.

## WHAT SHOULD YOU MENTION TO YOUR VACCINATION PROVIDER BEFORE YOU GET THE PFIZER-BIONTECH COVID-19 VACCINE?
**Tell the vaccination provider about all of your medical conditions, including if you:**
- have any allergies
- have a fever
- have a bleeding disorder or are on a blood thinner
- are immunocompromised or are on a medicine that affects your immune system
- are pregnant or plan to become pregnant
- are breastfeeding
- have received another COVID-19 vaccine

## WHO SHOULD GET THE PFIZER-BIONTECH COVID-19 VACCINE?
FDA has authorized the emergency use of the Pfizer-BioNTech COVID-19 Vaccine in individuals 16 years of age and older.

## WHO SHOULD <u>NOT</u> GET THE PFIZER-BIONTECH COVID-19 VACCINE?
You should not get the Pfizer-BioNTech COVID-19 Vaccine if you:
- had a severe allergic reaction after a previous dose of this vaccine
- had a severe allergic reaction to any ingredient of this vaccine

## WHAT ARE THE INGREDIENTS IN THE PFIZER-BIONTECH COVID-19 VACCINE?
The Pfizer BioNTech COVID-19 Vaccine includes the following ingredients: mRNA, lipids ((4-hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2-hexyldecanoate), 2 [(polyethylene glycol)-2000]-N,N-ditetradecylacetamide, 1,2-Distearoyl-sn-glycero-3-phosphocholine, and cholesterol), potassium chloride, monobasic potassium phosphate, sodium chloride, dibasic sodium phosphate dihydrate, and sucrose.

## HOW IS THE PFIZER-BIONTECH COVID-19 VACCINE GIVEN?
The Pfizer-BioNTech COVID-19 Vaccine will be given to you as an injection into the muscle.

The Pfizer-BioNTech COVID-19 Vaccine vaccination series is 2 doses given 3 weeks apart.

If you receive one dose of the Pfizer-BioNTech COVID-19 Vaccine, you should receive a second dose of this same vaccine 3 weeks later to complete the vaccination series.

Revised: December 2020

**HAS THE PFIZER-BIONTECH COVID-19 VACCINE BEEN USED BEFORE?**
The Pfizer-BioNTech COVID-19 Vaccine is an unapproved vaccine. In clinical trials, approximately 20,000 individuals 16 years of age and older have received at least 1 dose of the Pfizer-BioNTech COVID-19 Vaccine.

**WHAT ARE THE BENEFITS OF THE PFIZER-BIONTECH COVID-19 VACCINE?**
In an ongoing clinical trial, the Pfizer-BioNTech COVID-19 Vaccine has been shown to prevent COVID-19 following 2 doses given 3 weeks apart. The duration of protection against COVID-19 is currently unknown.

**WHAT ARE THE RISKS OF THE PFIZER-BIONTECH COVID-19 VACCINE?**
Side effects that have been reported with the Pfizer-BioNTech COVID-19 Vaccine include:
- injection site pain
- tiredness
- headache
- muscle pain
- chills
- joint pain
- fever
- injection site swelling
- injection site redness
- nausea
- feeling unwell
- swollen lymph nodes (lymphadenopathy)

There is a remote chance that the Pfizer-BioNTech COVID-19 Vaccine could cause a severe allergic reaction. A severe allergic reaction would usually occur within a few minutes to one hour after getting a dose of the Pfizer-BioNTech COVID-19 Vaccine. Signs of a severe allergic reaction can include:
- Difficulty breathing
- Swelling of your face and throat
- A fast heartbeat
- A bad rash all over your body
- Dizziness and weakness

These may not be all the possible side effects of the Pfizer-BioNTech COVID-19 Vaccine. Serious and unexpected side effects may occur. Pfizer-BioNTech COVID-19 Vaccine is still being studied in clinical trials.

**WHAT SHOULD I DO ABOUT SIDE EFFECTS?**
If you experience a severe allergic reaction, call 9-1-1, or go to the nearest hospital.

Call the vaccination provider or your healthcare provider if you have any side effects that bother you or do not go away.

Revised: December 2020

Report vaccine side effects to **FDA/CDC Vaccine Adverse Event Reporting System (VAERS)**. The VAERS toll-free number is 1-800-822-7967 or report online to https://vaers.hhs.gov/reportevent.html. Please include "Pfizer-BioNTech COVID-19 Vaccine EUA" in the first line of box #18 of the report form.

In addition, you can report side effects to Pfizer Inc. at the contact information provided below.

| Website | Fax number | Telephone number |
|---|---|---|
| www.pfizersafetyreporting.com | 1-866-635-8337 | 1-800-438-1985 |

**WHAT IF I DECIDE NOT TO GET THE PFIZER-BIONTECH COVID-19 VACCINE?**
It is your choice to receive or not receive the Pfizer-BioNTech COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care.

**ARE OTHER CHOICES AVAILABLE FOR PREVENTING COVID-19 BESIDES PFIZER-BIONTECH COVID-19 VACCINE?**
Currently, there is no approved alternative vaccine available for prevention of COVID-19. FDA may allow the emergency use of other vaccines to prevent COVID-19.

**CAN I RECEIVE THE PFIZER-BIONTECH COVID-19 VACCINE WITH OTHER VACCINES?**
There is no information on the use of the Pfizer-BioNTech COVID-19 Vaccine with other vaccines.

**WHAT IF I AM PREGNANT OR BREASTFEEDING?**
If you are pregnant or breastfeeding, discuss your options with your healthcare provider.

**WILL THE PFIZER-BIONTECH COVID-19 VACCINE GIVE ME COVID-19?**
No. The Pfizer-BioNTech COVID-19 Vaccine does not contain SARS-CoV-2 and cannot give you COVID-19.

**KEEP YOUR VACCINATION CARD**
When you get your first dose, you will get a vaccination card to show you when to return for your second dose of Pfizer-BioNTech COVID-19 Vaccine. Remember to bring your card when you return.

Revised: December 2020

**ADDITIONAL INFORMATION**

If you have questions, visit the website or call the telephone number provided below.

To access the most recent Fact Sheets, please scan the QR code provided below.

| Global website | Telephone number |
|---|---|
| www.cvdvaccine.com | 1-877-829-2619 (1-877-VAX-CO19) |

## HOW CAN I LEARN MORE?

- Ask the vaccination provider.
- Visit CDC at https://www.cdc.gov/coronavirus/2019-ncov/index.html.
- Visit FDA at https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization.
- Contact your local or state public health department.

## WHERE WILL MY VACCINATION INFORMATION BE RECORDED?

The vaccination provider may include your vaccination information in your state/local jurisdiction's Immunization Information System (IIS) or other designated system. This will ensure that you receive the same vaccine when you return for the second dose. For more information about IISs visit: https://www.cdc.gov/vaccines/programs/iis/about.html.

## WHAT IS THE COUNTERMEASURES INJURY COMPENSATION PROGRAM?

The Countermeasures Injury Compensation Program (CICP) is a federal program that may help pay for costs of medical care and other specific expenses of certain people who have been seriously injured by certain medicines or vaccines, including this vaccine. Generally, a claim must be submitted to the CICP within one (1) year from the date of receiving the vaccine. To learn more about this program, visit www.hrsa.gov/cicp/ or call 1-855-266-2427.

## WHAT IS AN EMERGENCY USE AUTHORIZATION (EUA)?

The United States FDA has made the Pfizer-BioNTech COVID-19 Vaccine available under an emergency access mechanism called an EUA. The EUA is supported by a Secretary of Health and Human Services (HHS) declaration that circumstances exist to justify the emergency use of drugs and biological products during the COVID-19 pandemic.

The Pfizer-BioNTech COVID-19 Vaccine has not undergone the same type of review as an FDA-approved or cleared product. FDA may issue an EUA when certain criteria are met, which includes that there are no adequate, approved, available alternatives. In addition, the FDA decision is based on the totality of scientific evidence available showing that the product may be effective to prevent COVID-19 during the COVID-19

Revised: December 2020

pandemic and that the known and potential benefits of the product outweigh the known and potential risks of the product. All of these criteria must be met to allow for the product to be used in the treatment of patients during the COVID-19 pandemic.

The EUA for the Pfizer-BioNTech COVID-19 Vaccine is in effect for the duration of the COVID-19 EUA declaration justifying emergency use of these products, unless terminated or revoked (after which the products may no longer be used).



Manufactured by
Pfizer Inc., New York, NY 10017

BIONTECH
Manufactured for
BioNTech Manufacturing GmbH
An der Goldgrube 12
55131 Mainz, Germany

LAB-1451-0.7

Revised: December 2020



Scan to capture that this Fact Sheet was provided to vaccine recipient for the electronic medical records/immunization information systems.

Barcode Date: 12/2020



HOUSTON
**Methodist**
LEADING MEDICINE

### POLICY System_HR95 MANDATORY COVID-19 VACCINE PROCEDURE - PHASED IMPLEMENTATION

**Effective Date:** 04/01/2021

**Reference Number:** 24783

**Version:** 1

**Origination Date:** 04/01/2021

**Date Revised/Reviewed:** 04/01/2021

**Target Review Date:** 04/01/2024

**Originating Area:**
Human Resources

**Applies To:**
Houston Methodist Hospital, The Medical Center
Houston Methodist Baytown
Houston Methodist Clear Lake
Houston Methodist Continuing Care Hospital
Houston Methodist Sugar Land
Houston Methodist The Woodlands
Houston Methodist West
Houston Methodist Willowbrook
Houston Methodist Research Institute
Houston Methodist Corporate Division
Houston Methodist Global Health Care Services
Houston Methodist Institute for Academic Medicine
Houston Methodist Specialty Physician Group
Houston Methodist Primary Care Group
Houston Methodist Coordinated Care Organization

---

**I.   POLICY STATEMENT**

To create a safe environment, free of infection/transmission of disease and to protect our patients, employees, and the community from Sars-Cov-2 (COVID-19) infection, Houston Methodist is requiring mandatory immunization of all covered Houston Methodist (HM) employees.

**II.   PROCEDURES**

A.   The implementation of this policy will be conducted in phases. **HM Phase 1 employees** are defined as all HM management. This policy will be updated accordingly as additional phases are defined and implemented.

B.   COVID-19 vaccine will be available free of charge to all HM employees. The vaccination program will be coordinated through each HM entity's Employee Health department.  Employees also have the option of vaccination elsewhere from a third-party provider of their choice.

PLAINTIFF'S EXHIBIT
A
tabbies

C.   Proof of vaccination by a third party must include record of vaccine, the date of vaccine administration, lot number (should the lot be recalled), the location where the vaccine was administered, and the name of the vaccine administrator.

D.   In addition to the vaccination requirement, all HM employees are expected to comply with all other safety requirements defined for COVID-19 as indicated by HM management based on CDC and other applicable regulatory agencies that govern public health and/or patient safety.

E.   Phase 1 Employees:

1.   Subject to the exemptions defined in this policy, all HM Phase 1 employees who have not begun the vaccination process will be required:

a)   To get any approved one-dose vaccine (e.g., J&J) or provide proof of vaccination by a third-party provider to Employee Health **on or before April 15, 2021,**

b)   Get the first shot of any approved two-dose vaccine (e.g., Pfizer, Moderna) and schedule an appointment for a second dose, or proof of vaccination and date of second vaccine appointment from a third-party provider **on or before April 15, 2021**, or

c)   Apply for and submit all required documentation for an exemption based on a medical condition (including pregnancy deferment) or sincerely held religious belief **on or before April 7, 2021**, in accordance with the procedure described in this policy.

*If proof of vaccination is not provided, or if an exemption is not filed by the stated deadline, you will be assumed to have not completed the vaccine requirement on time.*

2.   HM Phase 1 employees who received only the first of the two-dose vaccine as of April 1, 2021, and whose second doses are scheduled after April 15, 2021, are required to provide the date of their second dose appointment to Employee Health by April 15, 2021.

If their second does is scheduled on or before April 15, 2021, they are required to provide proof of vaccination from a third-party provider, or present proof of vaccination by a third-party provider to Employee Health **on or before April 15, 2021**.

If proof is not provided, you will be assumed to have not timely completed the vaccine requirement.

3.   For all HM Phase 1 employees receiving a two-dose vaccine including those who received only a first dose when this policy was announced, proof of the second vaccination must be submitted to employee health within **two (2) days** after the second dose has been received.

If exceptional circumstances exist, and an employee is unable to receive the second dose at the appointed time, please contact Employee Health within **two (2) days** of the scheduled appointment.

If proof of vaccination or rescheduling due to exceptional circumstances is not provided by the stated deadlines, you will be assumed to have not completed the vaccine regimen on time.

4.   Any HM Phase 1 employee (i) who is not vaccinated with a first or second dose of the two-dose COVID-19 vaccine by **April 15, 2021**, or (ii) does not have an approved exemption as provided in this policy by **April 15, 2021** will be placed on a two-week, unpaid suspension.

If the vaccine regimen (including a second dose) is not completed before the expiration of the suspension period on **April 29, 2021**, HM will immediately initiate the employment termination process as described in this policy.

5.   Any HM Phase 1 employee who does not get a second dose at the appointed time will, absent exceptional circumstances, be placed on an immediate two-week, unpaid suspension.

If the second does is not administered before the expiration of the suspension period, HM will immediately initiate the employment termination process as described in this policy.

F.   Exemption Process and Protocols:

1.   Exemption from vaccination may be granted for medical contraindications (including pregnancy if properly supported by medical documentation) and sincerely held religious beliefs. Employees are required to submit a *Request for Medical Exemption from COVID-19 Vaccination* or *Request for Religious Exemption from COVID-19* to Employee Health via the Enterprise Portal/MARS Employee Self-Service portal, and any additional required certification that verifies the reason for the requested exemption.

2.   Employees will be notified within seven (7) days of submission of their application if it is approved or denied, and, if approved, of any restrictions or requirements they will be required to follow so long as they remain unvaccinated. If additional clarification is needed, employees will be contacted within the same time period and are expected to provide the requested clarification within five (5) days to Employee Health absent exceptional circumstances. No employment action will be taken until the exemption process is complete.

3.    Employees who applied for and were denied an exemption for a medical condition or a sincerely held religious belief as part of the HOPE bonus may apply again for an exemption through this process.

4.    Approved exemptions will only be valid for the year in which they were requested and/or the period for which the exemption is approved or the reason for the exemption persists. For example, if an exemption request is submitted and approved due to pregnancy, the employee will be required to obtain an extension of the exemption after the employee is no longer pregnant. Currently, exemptions for any or all future years will require completion and submission of a **Request for Medical/Religious Exemption from COVID-19 Vaccination** form each year an exemption is requested.

5.    Phase 1 Employees:

a)    **Request for Medical/Religious Exemption from COVID-19 Vaccine** must be submitted to Employee Health the employee's entity via email no later than **April 7, 2021**.

b)    Employee Health will also collect and document the **Request for Religious Exemption** from COVID-19 Vaccination. Exemption requests must be submitted by **April 7, 2021** and will be reviewed in accordance with HM HR policies.

c)    *No employment action will be taken until the exemption process is complete.*

G.    Consequences for Employee for Failure to Comply

1.    Failure of any employee to receive a COVID-19 vaccination or submit a Request for Exemption form by the deadline of their assigned vaccine implementation phase will result in the employee being placed on unpaid suspension (PTO may not be used during this time) for up to 14 days so that the employee can come into compliance.

2.    **HM Phase 1 employees** who come into compliance before the end of the applicable 14-day suspension period will be scheduled to return to work as soon as administratively possible based on department scheduling protocols. All employees who have not received both doses of the vaccine or are denied an exemption as of the completion of the applicable 14-day suspension period will be terminated from employment by HM.

3.    Failure to comply with protective measure requirements (such as surgical masks and face shields) for those employees approved for a medical or religious exemption from vaccination during the duration as directed, will result in an unpaid 3-day suspension for the first occurrence of non-compliance. Any and all subsequent failures to comply with protective measures requirements while at work will result in termination.

### III. MANAGEMENT RESPONSIBLITIES

A. Ensure 100% of covered employees are aware of this policy, the mandatory vaccine requirement, the exemption process, and any applicable educational materials regarding the vaccine, as appropriate.

B. Review weekly reports of each covered employee's status regarding compliance in obtaining COVID-19 vaccination or approved exemption.

C. Maintain the confidentiality of any medical information or information concerning vaccine status of employees. Such information should be treated as need to know only.

D. Management should refrain from asking employees follow up questions about their vaccine status that may tend to reveal a disability. If an employee indicates that they qualify for an exemption, the employee should be referred to the exemption process without being required to answer any further questions.

E. Ensure all employees, vaccinated or not, are aware of any department specific requirements related to using protective equipment when performing certain job activities within the department or elsewhere within the facility to minimize health risks to patients, self and others.

F. Ensure all employees with an exemption follow any additional required restrictions, safety protocols, or safety requirements related to using protective equipment when performing certain job activities within the department or elsewhere within the facility to minimize health risks to patients, self and others.

G. Ensure all policy and procedural steps are followed as outlined in this policy including communicating and administering the "failure to comply" consequences in a timely and consistent manner.

### IV. EMPLOYEE RESPONSIBILITIES

A. Ensure vaccination compliance by the stated deadline.

B. For those employees with approved exemptions, comply with all job restrictions, safety protocols, and safety requirements as directed due to non-vaccinated status. Wear appropriate PPE specified for non-vaccinated employees, which may include masks and/or face shields and other PPE for the period of time designated by management and/or infection control.

C. Follow all COVID related reporting and safety protocols, whether you are vaccinated or not.

### V. EMPLOYEE HEALTH RESPONSIBILITIES

A. Provide COVID-19 vaccinations to all employees during the designated timeframe with appropriate consent.

B.  Maintain all records of COVID-19 immunizations and exemptions, ensuring timely input of compliance in appropriate management information systems.

C.  Review the **Request for Medical/Religious Exemption from COVID-19 Vaccination document/s** in a timely manner and coordinate any clarifications as quickly as possible.

D.  Review all submitted documents and complete the **Request for Religious Exemption from COVID** process in accordance with HM HR policies.

E.  Work with appropriate departments/resources to provide additional health education consultation regarding benefits of vaccination and appropriate provision of protective equipment for non-vaccinated individuals.

F.  Ensure that personnel outside of Employee Health who have been designated to administer HM COVID-19 vaccines follow the same protocols including completion of appropriate consent forms by each individual they vaccinate.  These designated personnel are responsible for providing directly to a member of Employee Health the consent forms either via fax, email, or hand delivery (rather than through inter-office mail).

VI.  **HUMAN RESOURCE RESPONSIBILTIES**
Participate in review of **Request for Religious Exemption from COVID-19 Vaccination** in a timely manner and coordinate any clarifications as quickly as possible.

VII.  **SIGNATURE OF APPROVING EXECUTIVE:** Carole Hackett
**TITLE:** Senior Vice President, Human Resources, CHRO

SIGNATURE ON FILE

_____          _____

Signature of Approving Executive                              Date Signed

**Revision History**

| Revision | Date | Changed by | Revision Summary |
|----------|------|------------|------------------|
| 0 | 04/01/2011 | Michelle Parker | Original |



# PRESIDENT'S LETTER
## HOUSTON Methodist
### LEADING MEDICINE

APRIL 2021

As we continue our fight against COVID-19, it's now time for all employees to be vaccinated against this deadly virus. We first mandated the vaccine for our newly hired employees and for executives and managers who are now 100% compliant. Now it is your turn. Already 84% of you have received your vaccination, and I am grateful for your decision to do this to protect our patients. Those of you who have not been vaccinated yet have until June 7. Please see the HR policy that outlines the consequences of not being compliant by June 7, which include suspension and eventually termination.

Mandating the vaccine was not a decision we made lightly. The process was reminiscent of how we made the decision to become one of the first in the country to mandate the flu vaccine in 2009. Because science has proven that the COVID-19 vaccines are not only safe, but extremely effective, it became an easier decision to make. The FDA's recent decision to pause the administration of the Johnson & Johnson vaccine proves how carefully the vaccines are being monitored. Like we do, the FDA takes patient safety very seriously and paused the J&J vaccine after six people, out of 6.8 million doses, reported severe side effects. We primarily administer the Pfizer vaccine, which uses mRNA technology, which has now been used safely in well over 100 million individuals in the U.S. alone.

Now we must do our part to keep patients and ourselves safe. And please know, we would never ask you to do anything that we thought was unsafe.

Since we announced publicly that we were making the vaccine mandatory we have received both kudos and skepticism—but we're leading the way. Now CEOs of other health care institutions are calling nearly every day to ask how we are doing it. It takes courage to be first, and to make the tough decisions for the right reasons. I sincerely hope you all make the right decision and decide to get vaccinated if you haven't already. To help you with any remaining questions, please see this FAQ and plan to join a panel of Houston Methodist experts on a town hall tomorrow (Friday) from noon-1 p.m. Access the town hall by visiting this link.

If you are interested, below is an editorial I shared with a few media outlets recently about the importance of all health care workers being vaccinated. It further explains why we made



PLAINTIFF'S
EXHIBIT
B

the decision to make the vaccine mandatory. As always, please share any feedback you have with me by using the "feedback" button below.

On March 31, Houston Methodist became the first major health care system in the U.S. to require mandatory COVID-19 vaccinations. We started with managers and new hires, and all employees (26,000 of them) and employed physicians will be close behind. Since the first vaccine was approved, more than 195 million doses have been administered safely in the U.S. alone. With supplies of the vaccine more abundant, it's now time that all health care systems follow our example and begin requiring employees to be vaccinated. This will send a strong message that we're doing everything possible to keep patients safe. We'd also be role models for those who may be hesitating to get a vaccine.

As health care workers we've taken a sacred oath to do everything possible to keep our patients safe and healthy – this includes getting vaccinated. This isn't the first time our industry has stepped up and made vaccines mandatory. Not long ago, flu vaccines were voluntary for health care workers. Today, 17 states require flu vaccines for health care workers. The numbers clearly show we should treat COVID-19 far more seriously than the flu. According to the CDC, the flu has accounted for between 12,000 to 61,000 deaths a year since 2010 in the U.S. The CDC also reports that the last two major flu outbreaks in 1957 and 1968 accounted for 116,000 and 100,000 deaths in the U.S. respectively. If we mandate flu vaccines for these numbers, we should also mandate COVID-19 vaccines given how much more deadly it is.

Frontline workers have battled courageously against COVID-19 working long hours to keep patients alive. They've done so at risk to their own health regardless of the many precautions we take to keep them safe. Behind the scenes, researchers and physicians have worked tirelessly to find new treatments and cures to keep those who do contract the disease from its worst outcomes – including death. While we've made tremendous strides, our best shot at defeating it continues to be vaccinating enough Americans to create herd immunity.

Houston Methodist began vaccinating employees on Dec. 11, 2020. Today, more than 84% of our staff is vaccinated. Already we're seeing positive results as the number of employee infections has dropped inversely with the number of employees receiving the vaccine. It appears we've successfully created herd immunity at Houston Methodist.

Creating herd immunity is perhaps more important than ever before the virus mutates into something that sets us further back. Already we've seen different variants that are proving to be more formidable than the original strain. The more time we give this virus to spread, is the more time we give it to mutate. The U.K. variant has proven to be more contagious than its predecessor. A genome

sequencing team at Houston Methodist estimates it's now the prevalent variant in the region.

The numbers of those contracting the disease and dying from it both continue to grow. Already more than 564,000 Americans have died as a result of the virus. This number does not include those who have lost their life indirectly as a result of this virus. Last year, hospitals around the country learned that thousands of patients ignored serious health warnings and chose not to go to hospitals or EDs fearing they'd catch COVID-19. They preferred to stay home and deal with the consequences than risk catching the virus. Let's give patients the peace of mind they deserve knowing that our hospitals are safe from COVID-19.

Requiring mandatory vaccinations isn't just about safety. It's also about being examples for those who are hesitant to get vaccinated. Leaders at all levels have championed the vaccine and are doing everything to educate those reluctant to receive the vaccine. By mandating vaccines health care institutions will show the world that we trust the safety and efficacy of the vaccine, hopefully setting an example that other others will follow.

Most health care workers will agree that the path toward any sort of return to "normal" must be firmly centered on vaccinating as many Americans as possible to create herd immunity. Not only must we help get us there by administering the vaccine, but also by setting an example for others to follow. I hope other health care systems and employers will quickly join Houston Methodist in making the vaccine mandatory for staff. The sooner we're able to end this pandemic, the fewer lives we will continue to lose to it and the closer we can get to normal.

**Marc L. Boom, M.D.**
**President**
**Chief Executive Officer**
**Houston Methodist**

FEEDBACK



**POLICY System_HR95  MANDATORY  COVID-19  VACCINE  PROCEDURE  - PHASED
IMPLEMENTATION**

**Effective Date:** 04/14/2021

**Reference Number:** 24783

**Version:** 2

**Origination Date:** 04/01/2021

**Date Revised/Reviewed:** 04/15/2021

**Target Review Date:** 04/14/2024

**Originating Area:**
Human Resources

**Applies To:**
Houston Methodist Hospital, The Medical Center
Houston Methodist Baytown
Houston Methodist Clear Lake
Houston Methodist Continuing Care Hospital
Houston Methodist Sugar Land
Houston Methodist The Woodlands
Houston Methodist West
Houston Methodist Willowbrook
Houston Methodist Research Institute
Houston Methodist Corporate Division
Houston Methodist Global Health Care Services
Houston Methodist Institute for Academic Medicine
Houston Methodist Specialty Physician Group
Houston Methodist Primary Care Group
Houston Methodist Coordinated Care Organization

## I.   POLICY STATEMENT

To create a safe environment, free of infection/transmission of disease and to protect our
patients, employees, and the community from Sars-Cov-2 (COVID-19) infection, Houston
Methodist is requiring mandatory immunization of all covered Houston Methodist (HM)
employees.

## II.   PROCEDURES

A.   The implementation of this policy will be conducted in phases.
**HM Phase 1 employees** are defined as all HM management.
**HM Phase 2 employees** are defined as all HM employees not covered in Phase
1.
In the event this policy is extended beyond HM employees, it will be updated
accordingly as additional phases are defined and implemented.



**PLAINTIFF'S
EXHIBIT
C**

B.   COVID-19 vaccine will be available free of charge to all HM employees. The vaccination program will be coordinated through each HM entity's Employee Health department.  Employees also have the option of vaccination elsewhere from a third-party provider of their choice.

C.   Proof of vaccination by a third party must include record of vaccine, the date of vaccine administration, lot number (should the lot be recalled), the location where the vaccine was administered.

D.   In addition to the vaccination requirement, all HM employees are expected to comply with all other safety requirements defined for COVID-19 as indicated by HM management based on CDC and other applicable regulatory agencies that govern public health and/or patient safety.

E.   Phase 1 Employees:

1.   Subject to the exemptions defined in this policy, all HM Phase 1 employees who have not begun the vaccination process will be required:

a)   To get any approved one-dose vaccine (e.g., J&J) or provide proof of vaccination by a third-party provider to Employee Health **on or before April 15, 2021**,

b)   Get the first shot of any approved two-dose vaccine (e.g., Pfizer, Moderna) and schedule an appointment for a second dose, or proof of vaccination and date of second vaccine appointment from a third-party provider **on or before April 15, 2021**, or

c)   Apply for and submit all required documentation for an exemption based on a medical condition (including pregnancy deferment) or sincerely held religious belief **on or before April 7, 2021**, in accordance with the procedure described in this policy.

*If proof of vaccination is not provided, or if an exemption is not filed by the stated deadline, you will be assumed to have not completed the vaccine requirement on time.*

2.   HM Phase 1 employees who received only the first of the two-dose vaccine as of April 1, 2021, and whose second doses are scheduled after April 15, 2021, are required to provide the date of their second dose appointment to Employee Health by April 15, 2021.

If their second dose is scheduled on or before April 15, 2021, they are required to provide proof of vaccination from a third-party provider, or present proof of vaccination by a third-party provider to Employee Health **on or before April 15, 2021**.

If proof is not provided, you will be assumed to have not timely completed the vaccine requirement.

3.  For all HM Phase 1 employees receiving a two-dose vaccine including those who received only a first dose when this policy was announced, proof of the second vaccination must be submitted to employee health within **two (2) days** after the second dose has been received.

    If exceptional circumstances exist, and an employee is unable to receive the second dose at the appointed time, please contact Employee Health within **two (2) days** of the scheduled appointment.

    If proof of vaccination or rescheduling due to exceptional circumstances is not provided by the stated deadlines, you will be assumed to have not completed the vaccine regimen on time.

4.  Any HM Phase 1 employee (i) who is not vaccinated with a first or second dose of the two-dose COVID-19 vaccine by **April 15, 2021**, or (ii) does not have an approved exemption as provided in this policy by **April 15, 2021** will be placed on a two-week, unpaid suspension.

    If the vaccine regimen (including a second dose) is not completed before the expiration of the suspension period on **April 29, 2021**, HM will immediately initiate the employment termination process as described in this policy.

5.  Any HM Phase 1 employee who does not get a second dose at the appointed time will, absent exceptional circumstances, be placed on an immediate two-week, unpaid suspension.

    If the second dose is not administered before the expiration of the suspension period, HM will immediately initiate the employment termination process as described in this policy.

F.  Phase 2 Employees:

1.  Subject to the exemptions defined in this policy, all HM Phase 2 employees who have not begun the vaccination process will be required:

    a)  To get any approved one-dose vaccine (e.g., J&J) or provide proof of vaccination by a third-party provider to Employee Health **on or before June 7, 2021**,

    b)  To receive both doses of any approved two-dose vaccine (e.g., Pfizer, Moderna) through HM, or provide proof of vaccination from a third-party provider **on or before June 7, 2021**. Since scheduling second vaccinations varies on the manufacturer guidelines and availability of appointments with providers, employees are highly encouraged to receive their first vaccination of a 2-dose vaccine no later than May 7, 2021 to ensure compliance with complete vaccination by June 7, 2021.

c)  Apply for and submit all required documentation for an exemption based on a medical condition (including pregnancy deferment) or sincerely held religious belief **on or before May 3, 2021**, in accordance with the procedure described in this policy.

Employees whose exemptions are denied after May 3, 2021 must follow the following protocol:

(1)  Get any approved one-dose vaccine (e.g., J&J) or provide proof of vaccination by a third-party provider to Employee Health on or before June 7, 2021, or

(2)  Schedule the first appointment for a two-dose vaccine to be completed within one week of the exemption denial date. If received through a third-party provider, proof of the first vaccination **and** the date of the second dose appointment must be submitted to Employee Health within **(2) days** of the scheduled appointment or by June 1, whichever comes later.

If the second dose is received from a third-party, proof of completion of the second dose through must be submitted to Employee Health within (2) days of the scheduled appointment or by June 7, whichever comes later.

*If proof of vaccination or scheduled vaccination dates are not provided by the stated deadlines above, you will be assumed to have not completed the vaccine requirement on time.*

2.  Any HM Phase 2 employee who does not meet the vaccine program requirements as outlined in section F.1 will be placed on a two-week, unpaid suspension starting June 8, 2021 (or later as applicable for employees identified in section F.1.c above).

If the vaccine program requirements are not completed before the expiration of the suspension period on **June 21, 2021 or as otherwise stated for those receiving vaccinations after exemption denials**, HM will immediately initiate the employment termination process as described in this policy.

G.  Exemption Process and Protocols:

1.  Exemption from vaccination may be granted for medical contraindications (including pregnancy if properly supported by medical documentation) and sincerely held religious beliefs. Employees are required to submit a ***Request for Medical Exemption from COVID-19 Vaccination* or *Request for Religious Exemption from COVID-19* to Employee Health via the Enterprise Portal/MARS Employee Self-Service portal,** and any additional required certification that verifies the reason for the requested exemption.

2.      Employees will be notified within seven (7) days of submission of their application if it is approved or denied, and, if approved, of any restrictions or requirements they will be required to follow so long as they remain unvaccinated. If additional clarification is needed, employees will be contacted within the same time period and are expected to provide the requested clarification within five (5) days to Employee Health absent exceptional circumstances. No employment action will be taken until the exemption process is complete.

3.      Employees who applied for and were denied an exemption for a medical condition or a sincerely held religious belief as part of the HOPE bonus may apply again for an exemption through this process.

4.      Approved exemptions will only be valid for the year in which they were requested and/or the period for which the exemption is approved or the reason for the exemption persists. For example, if an exemption request is submitted and approved due to pregnancy, the employee will be required to obtain an extension of the exemption after the employee is no longer pregnant. Currently, exemptions for any or all future years will require completion and submission of a ***Request for Medical/Religious Exemption from COVID-19 Vaccination*** form each year an exemption is requested.

5.      Phase 1 Employees:

   a)     ***Request for Medical/Religious Exemption from COVID-19 Vaccine*** must be submitted to Employee Health the employee's entity via email no later than **April 7, 2021**.

   b)     Employee Health will also collect and document the ***Request for Religious Exemption*** from COVID-19 Vaccination. Exemption requests must be submitted by **April 7, 2021** and will be reviewed in accordance with HM HR policies.

   c)     *No employment action will be taken until the exemption process is complete.*

6.      Phase 2 Employees: See Section F.

H.     Consequences for Employee for Failure to Comply

1.     Failure of any employee to receive a COVID-19 vaccination or comply with the stated deadlines for completing the Request for Exemption process by the stated deadlines of their assigned vaccine implementation phase will result in the employee being placed on unpaid suspension (PTO may not be used during this time) for up to 14 days so that the employee can come into compliance.

2.     **HM Phase 1 and 2 employees** who come into compliance before the end of the applicable 14-day suspension period will be scheduled to return to work as soon as administratively possible based on department scheduling protocols. All employees who have not received both doses of the vaccine or are met the exemption requirements as of the completion of the applicable 14-day suspension period will be terminated from employment by HM.

3.     Failure to comply with protective measure requirements (such as surgical masks and face shields) for those employees approved for a medical or religious exemption from vaccination during the duration as directed, will result in an unpaid 3-day suspension for the first occurrence of non-compliance. Any and all subsequent failures to comply with protective measures requirements while at work will result in termination.

III.   **MANAGEMENT RESPONSIBLITIES**

A.     Ensure 100% of covered employees are aware of this policy, the mandatory vaccine requirement, the exemption process, and any applicable educational materials regarding the vaccine, as appropriate.

B.     Review weekly reports of each covered employee's status regarding compliance in obtaining COVID-19 vaccination or approved exemption.

C.     Maintain the confidentiality of any medical information or information concerning vaccine status of employees. Such information should be treated as need to know only.

D.     Management should refrain from asking employees follow up questions about their vaccine status that may tend to reveal a disability. If an employee indicates that they qualify for an exemption, the employee should be referred to the exemption process without being required to answer any further questions.

E.     Ensure all employees, vaccinated or not, are aware of any department specific requirements related to using protective equipment when performing certain job activities within the department or elsewhere within the facility to minimize health risks to patients, self and others.

F.     Ensure all employees with an exemption follow any additional required restrictions, safety protocols, or safety requirements related to using protective equipment when performing certain job activities within the department or elsewhere within the facility to minimize health risks to patients, self and others.

G.    Ensure all policy and procedural steps are followed as outlined in this policy including communicating and administering the "failure to comply" consequences in a timely and consistent manner.

## IV.   EMPLOYEE RESPONSIBILITIES

A.    Ensure vaccination compliance by the stated deadline for your implementation phase.

B.    For those employees with approved exemptions, comply with all job restrictions, safety protocols, and safety requirements as directed due to non-vaccinated status. Wear appropriate PPE specified for non-vaccinated employees, which may include masks and/or face shields and other PPE for the period of time designated by management and/or infection control.

C.    Follow all COVID related reporting and safety protocols, whether you are vaccinated or not.

## V.   EMPLOYEE HEALTH RESPONSIBILITIES

A.    Provide COVID-19 vaccinations to all employees during the designated timeframe with appropriate consent.

B.    Maintain all records of COVID-19 immunizations and exemptions, ensuring timely input of compliance in appropriate management information systems.

C.    Review the **Request for Medical/Religious Exemption from COVID-19 Vaccination document/s** in a timely manner and coordinate any clarifications as quickly as possible.

D.    Review all submitted documents and complete the **Request for Religious Exemption from COVID** process in accordance with HM HR policies.

E.    Work with appropriate departments/resources to provide additional health education consultation regarding benefits of vaccination and appropriate provision of protective equipment for non-vaccinated individuals.

F.    Ensure that personnel outside of Employee Health who have been designated to administer HM COVID-19 vaccines follow the same protocols including completion of appropriate consent forms by each individual they vaccinate. These designated personnel are responsible for providing directly to a member of Employee Health the consent forms either via fax, email, or hand delivery (rather than through inter-office mail).

## VI.   HUMAN RESOURCE RESPONSIBILTIES

A.    Participate in review of **Request for Religious Exemption from COVID-19 Vaccination** in a timely manner and coordinate any clarifications as quickly as possible.

B.    Monitor employee compliance and ensure suspension and termination for non-compliance are followed in accordance with policy.

VII.    **SIGNATURE OF APPROVING EXECUTIVE:** Carole Hackett
**TITLE:** Senior Vice President, Human Resources, CHRO

SIGNATURE ON FILE

_____       _____
Signature of Approving Executive           Date Signed

**Revision History**

| Revision | Date | Changed by | Revision Summary |
|---|---|---|---|
| 0 | 04/01/2021 | Michelle Parker | Original |
| 1 | 04/09/2021 | Michelle Parker | Added Phase II details for all non-management employees. |

## While the pandemic isn't over yet, seeing your Houston Methodist doctor is still smart — and safe.

No matter what's going on in the world, taking care of your health should always be a priority. At Houston Methodist, our primary and specialty care doctors are available to provide expert care for you and your family — safely. And we are taking it one step further to protect you: Houston Methodist will require all employees and employed physicians to get a COVID-19 vaccine. See your doctor virtually or in person, or use Virtual Urgent Care for 24/7 on-demand video visits.

**Schedule an appointment today.**
houstonmethodist.org/care-options
713.790.3333

05.2021

HOUSTON
Methodist
LEADING MEDICINE

6445 Main St.
Houston, TX 77030

If you prefer not to receive future communication from Houston Methodist, please email optout@houstonmethodist.org or call 713.790.3333.

# YOUR HEALTH IS STILL IMPORTANT

HOUSTON
Methodist®
LEADING MEDICINE



**Scan to schedule an appointment.**



PLAINTIFF'S EXHIBIT
D